IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| **SCHINDLER ELEVATOR** § | | **PLAINTIFF/** |
| **CORPORATION** § | | **COUNTER-DEFENDANT** |
| § | | |
| v. § | | Civil Action No. 1:09cv768-LG-RHW |
| § | | |
| **RIVERBOAT CORPORATION** § | | **DEFENDANT/** |
| **OF MISSISSIPPI** § | | **COUNTER-PLAINTIFF** |

**MEMORANDUM OPINION AND ORDER CONCERNING
<u>DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT</u>**

**BEFORE THE COURT** are Riverboat Corporation of Mississippi's Motion for Summary Judgment [55] as to the Amended Complaint [11] filed by Schindler Elevator Corporation and the Motion for Partial Summary Judgment [58] as to the counterclaim for breach of contract filed by Riverboat. Riverboat argues that Schindler breached the parties' Preventive Maintenance Agreement, which entitled Riverboat to terminate the contract. Therefore, Riverboat argues that it is entitled to partial summary judgment as to its counterclaim for breach of contract, and it argues that it is entitled to summary judgment as to all of Schindler's claims. Upon reviewing the submissions of the parties and the applicable law, the Court finds that Riverboat's Motion for Summary Judgment as to Schindler's claims should be granted as to Schindler's claim for liquidated damages due to premature termination but denied in all other respects. The Court further finds that Riverboat is entitled to partial summary judgment as to its counterclaim for breach of contract.

**Facts**

Riverboat owns the Isle of Capri Hotel in Biloxi, Mississippi. On June 1, 1995,

it entered into a Preventive Maintenance Agreement (PMA) with Schindler in which Schindler agreed to perform preventive maintenance operations and tests on the elevators and escalators at the Isle "in accordance with a carefully designed maintenance schedule." (Ex. A to Def.'s Mot. [55] at 2). The PMA continued in full force and effect for a period of five years and for successive five-year renewal periods. (*Id.* at 6). In the PMA, Schindler agreed to "periodically examine, clean, lubricate, adjust and, as needed, repair or replace" certain safety devices including interlocks, door closers, buffers, slowdown switches, and escalator brakes. (*Id.* at 2) Schindler also agreed to "have a Schindler service superintendent perform a periodic survey of the equipment to verify that it conforms to our maintenance requirements." (*Id.*) It further stated, "We also conduct audits of our maintenance procedures by trained headquarters personnel, for the purpose of maintaining our higher Schindler standards." (*Id.*) Schindler also agreed to provide technical support and consultation services to Riverboat. (*Id.*)

In addition, Schindler agreed to maintain a supply of frequently used replacement parts and lubricants selected for use with Riverboat's equipment. (*Id.* at 3). As part of its preventive maintenance service for traction and hydraulic elevators, Schindler agreed to "[e]xamine, clean, lubricate, adjust and, as needed, repair and replace the following: elevator machines, motor generators or solid state motor drive components, controller components, machine brakes, pumps, valves, motors and parts thereof . . . ." (*Id.*) It also agreed, among other things, to keep guide rails properly

lubricated, to replace guide shoe gibs or rollers as needed, to repair or replace control cables, as needed, and to periodically clean the elevator machine room, pit, hatch, and hatch equipment. (*Id.*) It agreed to provide similar preventive maintenance for escalators, including periodic cleaning, lubrication, adjustments, repairs, and replacements. (*Id.* at 3-4). The parties agreed that Schindler would not be responsible "for any loss, damage, detention or delay caused by . . . severe or unusual weather conditions, . . . acts of God, or by any other cause beyond [Schindler's control]." (*Id.* at 6).

The PMA provides that if Riverboat prematurely cancels the agreement, Riverboat will be required to pay liquidated damages totaling one half of the then current monthly agreement price times the number of months remaining between the premature cancellation date and the agreement termination date. (*Id.* at 7). Finally, the PMA contains the following cure provision:

> If either party shall default in the performance of any of its obligations, the non-defaulting party shall send a written notice reasonably describing the default. If the defaulting party, within a reasonable time (not to exceed thirty (30) days), does not commence to take reasonable steps to cure the default, or if having timely commenced, fails to carry the cure to reasonable and timely completion, the non-defaulting party, by a further thirty (30) days written notice, may terminate this agreement.

(*Id.* at 9).

On March 16, 2009, Richard Emmons, the Senior Director of Corporate Facilities at the Isle, sent a letter to Richard Garrison, the Schindler Sales Respresentative assigned to the Riverboat account, providing notice of numerous deficiencies in Schindler's service under the PMA. (Ex. G to Def.'s Mot. [55]). Emmons requested that

-3-

the deficiencies be corrected within thirty days. (*Id.*) He attached approximately fourteen pages of photographs depicting damaged, rusty, or dirty equipment, along with citations to the safety code applicable to elevators and escalators. (*Id.*) He also described the damage and requested certain maintenance, cleaning, and repairs. (*Id.*) Emmons further claimed that Schindler had charged Riverboat for repairs that should have been covered under the PMA, and he described the invoices related to these repairs and explained why he felt they should have been covered under the PMA. (*Id.*)

On March 23, 2009, Robert Callahan, litigation counsel for Schindler, sent a letter to Emmons, stating that "Schindler is reviewing the issues outlined in [Emmons'] correspondence and will provide a detailed response." (Ex. 7 to Pl.'s Resp. [64]). Callahan also noted that the SIM cards, which he described as tools that allow Schindler to better maintain its product, for elevators 8 and 9 had been removed from the elevator controllers. (*Id.*) He requested the return of these cards. (*Id.*)

On April 2, 2009, Garrison sent a letter to Emmons, stating that Schindler disagreed with many of the items outlined in Emmons' correspondence, but Garrison did not specify the items with which he disagreed. (Ex. H to Def.'s Mot. [55]). He noted that the Isle had suffered repeated water damage as a result of Hurricanes Katrina, Gustav, and Ike. (*Id.*) He claimed that the vast majority of the items described by Emmons were directly related to water damage. (*Id.*) Finally, Garrison stated, "Schindler will address those issues that are covered under the agreement. If you would like, we will provide you with updated proposals to repair the water damage

that is outside the scope [o]f the agreement." (*Id.*)

Emmons responded to the April 2nd letter, expressing his disappointment with Schindler's response. (Ex. 9 to Pl.'s Resp. [64]). He claimed that Schindler had provided substandard service and had failed to maintain an extensive inventory of replacement parts, which resulted in equipment being out of service for lengthy periods of time while they waited for parts to arrive. (*Id.*) He also noted that Schindler failed to respond to telephone calls and emails asking for updates on the equipment. (*Id.*) He pointed out that he had described numerous safety and housekeeping issues in his March letter that are covered under the PMA. (*Id.*) He expressed the Isle's expectation that all outstanding work be completed within the thirty-day time period that began when he sent his initial notice of deficiencies. (*Id.*) He asked Garrison to provide a written description of each item that he feels is not covered under the PMA, along with the reason why he feels it is not covered. (*Id.*) There is no evidence in the record that Schindler responded to this letter.

Emmons sent another letter to Garrison on May 4, 2009, noting that the Isle had allowed Schindler over thirty days to correct the deficiencies detailed in the March 16, 2009 letter. (Ex. I to Def.'s Mot. [55]). He mentioned that several weeks had passed since his last letter, and the Isle had received no response. (*Id.*) He also stated that the Isle had not seen any effort on the part of Schindler to resolve any of the issues detailed in the March 16th letter. (*Id.*) He therefore explained that Riverboat and the Isle were terminating the PMA effective June 10, 2009. (*Id.*)

Callahan responded to the termination letter on behalf of Schindler on May 12, 2009. (Ex. 11 to Pl.'s Resp. [64]). He again expressed Schindler's position that water damage had caused "the vast majority" of the problems with the equipment, and thus, the problems are not covered under the PMA. (*Id.*) Nevertheless, he stated, "However, we will take care of the housekeeping issues, such as the untidy wiring in the controller." (*Id.*) He noted that the PMA did not expire until June 1, 2010, and that Schindler intended to honor its obligations under the agreement. (*Id.*) He warned that Schindler would enforce its rights under the PMA if the Isle terminated the PMA prematurely. (*Id.*) Finally, he once again requested return of the SIM cards and threatened legal action if they were not returned. (*Id.*)

On November 16, 2009, Schindler filed the present lawsuit, and it filed an Amended Complaint [11] on January 22, 2010. It seeks liquidated damages due to the alleged premature cancellation of the PMA. Schindler also claims that Riverboat owes $9,118.13 for work performed prior to cancellation. Finally, Schindler claims that it owns the two SIM cards that were removed prior to the cancellation, and it seeks their return.

Riverboat filed a counterclaim against Schindler alleging breach of contract, breach of express and implied warranties, and breach of the duty of good faith and fair dealing. It claims that is has suffered at least $200,000 in damages as a result of Schindler's failure to perform preventive maintenance. Riverboat further alleges that Schindler had improperly billed Riverboat for work that should have been covered under the PMA, and it seeks reimbursement. Riverboat has filed the present motions

for summary judgment and partial summary judgment.

## DISCUSSION

Any party to a civil action may move for summary judgment upon a claim, counterclaim, or cross-claim as to which there is no genuine issue of material fact and upon which the moving party is entitled to prevail as a matter of law. Fed. R. Civ. P. 56. A party seeking summary judgment bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant carries its burden, the burden shifts to the non-movant to show that summary judgment should not be granted. *Celotex Corp.*, 477 U.S. at 324-25. The non-moving party may not rest upon mere allegations or denials in its pleadings but must set forth specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

**A. Whether Schindler Breached the PMA:**

In its Amended Complaint and Motions for Summary Judgment and Partial Summary Judgment, Riverboat alleges that Schindler breached the PMA by failing to inspect the equipment, by failing to perform maintenance, failing to adhere to safety standards, failing to perform maintenance surveys or audits of the equipment, and failing to stock parts. The safety issues discussed by Riverboat included the removal of a buffer spring that would prevent an elevator car from having a sudden impact in the event the car over-travels. (Ex. F to Def.'s Mot. [55] at 30). Schindler's technician

who serviced the Isle for the last two years of the PMA admitted that he had no knowledge of the safety codes applicable to elevators, that he removed the buffer, and that he probably should not have done so.  (Ex. C to Def.'s Mot [55] at 58-59, 93). Riverboat also claims that Schindler used the incorrect size of cables on the garage elevators.  Finally, Riverboat argues that Schindler failed to tag and label cables as required by the safety code.  (Ex. F to Def.'s Mot. at 40-41; Ex. D to Def.'s Mot. [55] at 77).

In its responses to Riverboat's Motions, Schindler continues to claim that the Isle equipment was damaged in various storms, and such damages are not covered by the PMA.  Schindler further argues that the Isle rejected its proposals to repair these damages and refused to repair leaks in the elevator pits, because it was having financial difficulties.  Schindler asserts that a genuine issue of material fact exists regarding whether the deficiencies noted by Riverboat were caused by water damage and thus excluded by the PMA.  It also claims that the only times that commonly used parts were out of stock was immediately following hurricanes.  It further argues that an audit and a complete "clean down" of the equipment is not required by the PMA. Schindler does not dispute that a buffer was removed from one of the elevators or that this was improper, but it attempts to minimize this issue by noting that the elevator had two buffers.  It argues that termination of the PMA was improper, because any breach of the PMA committed by Schindler was not a material breach.  It also claims that the termination of the PMA was premature because Schindler had addressed the alleged deficiencies by claiming that the vast majority of the problems were caused by

water damage.

In response to Riverboat's Motions, Schindler does not address the deficiencies that Garrison and Callahan admitted were covered under the PMA and agreed to address. It has never explained which items it believed were covered and which were not, despite Riverboat's request that it do so. Furthermore, it has not provided any evidence to the Court that it ever cured these covered deficiencies. Schindler has not argued that Garrison or Callahan did not have authority to admit that certain items were covered, and it has not argued that these admissions were made in error.

In addition to the admissions by Garrison and Callahan, Schindler has not provided any evidence to dispute Riverboat's assertion that Schindler improperly removed a buffer, which is undisputedly a safety device, from one of the cars. There is no evidence that Schindler even attempted to correct this matter once it learned of the problem, and this issues certainly does not constitute water damage. Furthermore, Schindler has primarily addressed the oil leaks and rust in the equipment and has failed to provide evidence or testimony that would refute other deficiencies claimed by Riverboat. For example, Riverboat claims that the wiring in the elevator controller was loose and untidy and the controller covers had been removed, the elevator brakes were out of adjustment, the escalator chains were stretched beyond the adjustment point, and much of the equipment was very dirty. (Ex. G to Def.'s Mot. [55]; Ex. F to Def.'s Mot. [55] at 32, 33-34; Ex. D to Def.'s Mot. at 73-74). Furthermore, a child's shoe was found inside one of the escalators, which allegedly demonstrates Schindler's failure to regularly inspect the equipment. (Ex. E to Def.'s Mot. [55] at 96). It is unclear what

Schindler's position is as to these items, although Callahan did note that the wiring in the controller was covered under the PMA, and one of Schindler's technicians acknowledged that some of the equipment was dirty and the buffer should not have been removed. As a result, the Court finds that there is no genuine issue of material fact that Schindler failed to carry out its obligations under the PMA or that it failed to cure the deficiencies noted by Riverboat within thirty days. Therefore, the Court must address Schindler's argument that Riverboat is required to demonstrate that any breach of the PMA was material.

The Mississippi Supreme Court has explained,"The primary purpose of all contract construction principles and methods is to determine the intent of the contracting parties." *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So. 2d 107, 110 (¶6) (Miss. 2005) (quoting *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 752 (¶9) (Miss. 2003)). When interpreting a contract, a court must first look to the four corners of the contract itself and give effect to all of its clauses. *Facilities, Inc.*, 908 So. 2d at 111(¶10). The court's concern is "not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy." *Id.* Therefore, it would be improper for a court "to infer intent contrary to that emanating from the text at issue." *Id.* The court can only look beyond the contract's language if it determines that the contract is ambiguous. *Id.* "[T]he mere fact that the parties disagree about the meaning of a

contract does not make the contract ambiguous as a matter of law." *Id.* (quoting *Turner v. Terry*, 799 So. 2d 25, 32 (Miss. 2001)).

Generally, the Mississippi courts have held that termination of a contract is an extreme remedy that should be granted sparingly, and thus, termination is not proper where there is no material breach. *Ladner v. Pigg*, 919 So. 2d 100, 102 (¶7) (Miss. Ct. App. 2005). "A breach is material where there 'is a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats its purpose.'" *Pigg*, 919 So. 2d at 102 (¶7). However, the Mississippi Supreme Court has indicated that the parties to a contract may agree that a non-material breach is sufficient cause for termination, by utilizing clear language to that effect. *See UHS-Qualicare, Inc. v. Gulf Coast Cmty. Hosp.*, 525 So. 2d 746, 754-756 (Miss. 1987).

In the present case, the PMA's cure provision provides for termination if either party defaults in the performance of **any of its obligations**, as long as the defaulting party fails to take measures to cure the deficiencies. Thus, the language in the cure provision does not require a material breach. Any other interpretation would be contrary to the language utilized by Schindler in the PMA.

Nevertheless, even if a material breach were required, the Court finds that the primary purpose of the PMA was to provide for the regular maintenance and cleaning of equipment to ensure that it ran properly and safely. The deficiencies claimed by Riverboat, even when the disputed allegations of rust and oil leaks are discounted, demonstrate a failure to perform these services, and thus, a material breach. As a

-11-

result, the Court finds that Riverboat is entitled to summary judgment as to Schindler's claim for liquidated damages as a result of the termination of the PMA.

The Court also finds that Riverboat is entitled to partial summary judgment with regard to its counterclaim for breach of contract. The elements of a breach of contract claim are: (1) the existence of a valid and binding contract; (2) breach of the contract by the defendant; and (3) money damages suffered by the plaintiff. *Guinn v. Wilkerson*, 963 So. 2d 555, 558 (¶8) (Miss. Ct. App. 2006). As explained previously, it is undisputed that a valid contract existed, and there is no genuine issue of material fact that the contract was breached. Moreover, Riverboat certainly sustained damages as a result of the breach, since it was paying for a service that was, at least to some extent, not provided. It is important to note, however, that this Court's ruling only pertains to the allegations that Schindler failed to perform its housekeeping duties under the PMA to clean and maintain the equipment. The Court cannot determine as a matter of law, from the record before it, that Schindler failed to keep parts on hand or that the rust and oil leaks were covered under the PMA. Riverboat must demonstrate these portions of its claim at trial before it can recover damages related to those specific issues. As a result, Riverboat is entitled to partial summary judgment as to its breach of contract claim, but it will be required to demonstrate the amount of its damages at trial.

## B. Schindler's Claims for Return of the SIM Cards and for Payment for Services Rendered Prior to Termination of the PMA:

Riverboat fails to adequately address either of these claims made by Schindler

-12-

in its Amended Complaint. Therefore, to the extent that it seeks summary judgment regarding these claims, the motion is denied.

**IT IS THEREFORE ORDERED AND ADJUDGED** that Riverboat Corporation of Mississippi's Motion for Summary Judgment [55] as to the Amended Complaint [11] filed by Schindler Elevator Corporation is **GRANTED** as to Schindler's claim for liquidated damages and is **DENIED** in all other respects.

**IT IS FURTHER ORDERED AND ADJUDGED** that Riverboat Corporation of Mississippi's Motion for Partial Summary Judgment[58] as to its counterclaim for breach of contract is **GRANTED**.

**SO ORDERED AND ADJUDGED** this the 24th day of March, 2011.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE